**NEW ENGLAND HEALTH CARE EMPLOYEES UNION DISTRICT 1199, SEIU AFL–CIO, Nina Milner for herself and as class representative for beneficiaries and participants of the New England Health Care Employees Health Fund, and New England Health Care Employees Welfare Fund,**

v.

**MOUNT SINAI HOSPITAL, Steven J. Bongard in his official capacity as Chairman of the Commission on Hospitals and Health Care, and Connecticut Hospital Association.**

**No. 2:92–CV–1012 (JAC).**

United States District Court,
D. Connecticut.

Feb. 25, 1994.

Daniel E. Livingston, Susan Price–Livingston, Gould, Livingston, Adler & Pulda, Hartford, CT, for plaintiffs Union and Nina Milner.

John M. Creane, Michael E. Passero, Law Firm of John M. Creane, Milford, CT, for plaintiff New England Health Care Employees Welfare Fund.

Edward Wood Dunham, Karen L. Clute, Wiggin & Dana, New Haven, CT, for defendant Mount Sinai, Hosp. and the Connecticut Hosp. Ass'n.

Hugh Barber, Phyllis E. Hyman, Asst. Atty. Gen. for the State of Conn., Hartford, CT, for defendant Steven J. Bongard.

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, Chief Judge:

The questions presented are whether Connecticut's Uncompensated Care Pool Act, Conn.P.A. 91–2 and 92–16, as codified by Conn.Gen.Stat. § 19a–168 *et seq.*, and as amended by Conn.P.A. 93–44 and 93–229 (the "Act"), is preempted by (1) the Employee Retirement Income Security Act, 29 U.S.C. § 1144(a) ("ERISA"), and (2) the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA"). All parties have moved for summary judgment.

### BACKGROUND

The following facts are not disputed by the parties. The Act was adopted on December 17, 1991 by the Connecticut legislature. It was specifically designed to compensate hospitals for the cost of providing services to those unable to pay for such services—Connecticut's indigent, uninsured, and underinsured citizens. *See* Conn.Gen.Stat. § 19a–168. It aimed to do so by creating "an uncompensated care pool," to be administered by the Connecticut Commission on Hospitals and Health Care (the "Commission"), the state agency authorized to set hospital rates. *See* Conn.Gen.Stat. §§ 19a–168, 168b(a) (creation and administration of the uncompensated care pool); §§ 19a–146, 151 (membership and rate-setting authority of the Commission).

Initially, the uncompensated care pool was funded by "an assessment on all payments to hospitals by *payers* other than Medicare, Medicaid and CHAMPUS [the Civilian Health and Medical Program of the Uniform Services]." Conn.P.A. 91–2, § 1, as amended by Conn.P.A. 92–16, § 55 (emphasis added). As amended in 1993 by Public Act 93–44, the statute provided that the pool was to be funded by a six percent sales tax on hospital services plus "an assessment on *all hospital charges* for patient care services except those rendered to patients whose services are covered by Medicare, medical assistance and CHAMPUS." Conn.P.A. 93–44, § 8 (emphasis added). As further amended in 1993 by Public Act 93–229, the Act now provides that the pool is to be funded by a six percent sales tax on hospital services plus an assessment on "*all hospitals,*" Conn.P.A. 93–229, § 8 (emphasis added), meaning that the assessment "shall be a uniform per cent of the *hospital's revenues* for patient care services except those rendered to patients whose services are covered by Medicare, medical assistance and CHAMPUS." Conn.P.A. 93–229, § 10 (emphasis added).

Until the most recent amendments, the Act directed hospitals to add the assessment—at a rate set by the Commission—to the price charged for hospital services. Conn.Gen.Stat. § 19a–168b(c)(6), as amended by Conn.P.A. 93–44, § 10. The Act now directs hospitals to remit the assessment to the state, without specifying the manner in which it is collected from paying patients. *Id.,* as amended by Conn.P.A. 93–229, § 11. At the time the instant action was filed, the plaintiffs claim that the assessment resulted in a 30.7% "surcharge" for each hospital service.

The Act requires hospitals to allocate any payments received for services to pay the

assessment in full, prior to discharging the remainder of the bill. Conn.Gen.Stat. § 19a–168b(c)(6), as amended by Conn.P.A. 93–229, § 11. After a hospital collects the assessment and remits it to the state, it is pooled in an account maintained by the Department of Income Maintenance, and from there it is periodically redistributed to the hospitals in proportion to their levels of uncompensated care. Conn.Gen.Stat. § 19a–168b(d)(1), as amended by Conn.P.A. 93–44, § 10.

Plaintiff Nina Milner is a member of plaintiff New England Health Care Employees Union, District 1199, SEIU AFL–CIO (the "Union"). Under the collective bargaining agreement negotiated between the Union and her employer, Lorraine Manor Nursing Home, Milner is entitled to participate in the New England Health Care Employees Welfare Fund (the "Fund")—which is also a plaintiff in this action.[1] The Fund is a multiemployer "welfare benefit plan," as that phrase is defined by ERISA, 29 U.S.C. § 1002(1). At the time the instant action was filed, Milner and other Fund participants were entitled to full payment by the Fund of certain medical expenses, among other benefits. Milner represents herself and a certified class of beneficiaries and participants of the Fund.[2]

In July 1992, Milner was hospitalized at defendant Mount Sinai Hospital on two occasions. After she was released from the hospital, her hospital bills, which included itemized "uncompensated care assessments," were forwarded to the Fund for payment. Upon receipt of her bills, the Fund notified Milner that it would not pay the uncompensated care assessments because "it might be against federal law for the Fund to pay those charges." Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment (filed Mar. 30, 1993) at 11. Accordingly, the Fund placed the amount of the uncompensated care assessments in escrow and sent a payment to Mount Sinai Hospital only for services rendered. When the Fund's payment was received, however, Mount Sinai Hospital first applied the payment to cover the uncompensated care assessments, as required by the Act. The hospital then demanded the unpaid balance from Milner.

Milner and the Union instituted the instant action for declaratory and injunctive relief against those charged with implementing the Act—the Commission, its then chairperson Steven J. Bongard, and Mount Sinai Hospital. By order of the court entered April 26, 1993, the Commission was dismissed from the action pursuant to the Eleventh Amendment, and the Connecticut Hospital Association, a non-profit association of health care facilities (including Mount Sinai Hospital), intervened as a defendant.

## DISCUSSION

The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). The court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities against the moving party. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986) (Feinberg, C.J.), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The court must therefore view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The plaintiffs have moved for summary judgment on the ground that Connecticut's Uncompensated Care Pool Act is preempted by ERISA and the NLRA. The defendants have cross-moved for summary judgment, ar-

---

1. The Fund was joined as a party plaintiff on April 26, 1993.

2. Class certification was granted, on consent of the parties, on July 12, 1993. The class certified includes the beneficiaries and participants of the Fund.

guing that the Act is a valid exercise of state authority which is not preempted by federal law. We turn first to the question of ERISA preemption.

## A.

■ Section 514(a) of ERISA provides: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a) (emphasis added).[3] This language is "conspicuous for its breadth," manifesting Congress's intent to establish regulation of employee benefit plans as an exclusively federal concern. *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). *See also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987).

■ The Supreme Court has repeatedly stated that a law "relates to" an ERISA plan and triggers ERISA preemption " 'if it has a connection with or reference to such a plan.' " *District of Columbia v. Greater Washington Bd. of Trade*, — U.S. —, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). A state law may "relate to" an ERISA plan "even if the law is not specifically designed to affect such plans or the effect is only indirect," *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) (citations omitted), as is the case with some laws of general applicability. *See Smith v. Dunham–Bush, Inc.*, 959 F.2d 6, 9 (2d Cir.1992) ("[A] state law of general application, with only an indirect effect on a pension plan, may neverthe-

less be considered to 'relate to' that plan for preemption purposes."). "Pre-emption does not occur, however, if the state law has only a 'tenuous, remote, or peripheral' connection with covered plans ... as is the case with many laws of general applicability." *Greater Washington Bd. of Trade*, — U.S. at — n. 1, 113 S.Ct. at 583 n. 1 (citations omitted). Thus, the Supreme Court has recognized that applying section 514(a) in the context of laws of general applicability presents a question of "line drawing." *See Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21 (recognizing that a law which expressly refers to ERISA plans "does not present a borderline question, and we express no views about where it would be appropriate to draw the line").

In the instant case, the plaintiffs argue that the Act—a law of general applicability—"relates to" the Fund because it substantially increases the cost to the Fund of providing health care benefits, and impinges on the structure and administration of the Fund by forcing it to finance the uncompensated care costs or restructure its benefits to avoid such costs. The defendants deny that the Act has either of these effects on the Fund. According to the defendants, the costs to the Fund and its participants are unaffected by the Act because, with or without state regulation, hospitals must—and will—shift their uncompensated care costs to paying patients. Furthermore, the defendants argue that the Act does not affect the structure or administration of the Fund because the choice of benefits remains a matter for the plan sponsors and employees. In addition, the defendants assert that a finding of ERISA preemption in the instant case would impair the operation of the federal Medicaid Act, 42 U.S.C. § 1396 *et seq.*, and the Medicare Act, 42 U.S.C.

---

**3.** Section 514(b), to which the preemption clause refers, contains the "savings clause" and the "deemer clause." The savings clause provides:
    Except as provided in subparagraph (B) [the deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.
29 U.S.C. § 1144(b)(2)(A). The "deemer clause" provides:
    Neither an employee benefit plan ... nor any trust established under such a plan, shall be

deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.
29 U.S.C. § 1144(b)(2)(B). Neither the savings clause nor the deemer clause is at issue in the instant case.

§ 1395 et seq., which recognize the authority of states to set hospital rates.

### 1. Dependence on the Existence of ERISA Plans

█ The stated purpose of the Act is to ensure that all citizens have adequate health care regardless of ability to pay. Despite this noble purpose, the Act has a disparate effect on ERISA plans and their participants. Indeed, the Connecticut statute depends on ERISA plans to accomplish its purpose. Data submitted by the plaintiffs—and not contested by the defendants—suggest that ERISA plans provide as much as 70% of the funding for the Act. *See* Plaintiffs New England Health Care Employees Union and Nina Milner's Supplemental Memorandum in Support of Motion for Summary Judgment (filed Sept. 2, 1993) at 5 (citing U.S. Dept. of Commerce, Bureau of the Census, *Current Population Reports: Health Insurance Coverage 1987–90*, 12). According to current United States census data, 70% of all privately-insured persons are covered by ERISA plans.[4] It is reasonable to extrapolate from this statistic that ERISA plans pay 70% of the assessments which fall on privately-insured patients under the Act.[5] Thus, without ERISA plans, the Act would not be economically viable. The State clearly recognized this fact when it included a provision in the Act which mandates the termination of the uncompensated care pool in the event that ERISA plans or their participants are exempted by judicial decisions from paying the assessments. *See* Conn.Gen.Stat. § 19a–

168m, as amended by Conn.P.A. 93–44, § 17.[6] Because the Act contemplates the existence of ERISA plans and depends on their participation, it is preempted by ERISA.

To the extent that this holding conflicts with *United Wire, Metal & Machine Health & Welfare Fund v. Morristown Memorial Hosp.*, 995 F.2d 1179 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 382, 126 L.Ed.2d 332, —— U.S. ——, 114 S.Ct. 383, 126 L.Ed.2d 332 (1993), the court declines to follow the reasoning of that case. *United Wire* concerned a New Jersey statute (similar to Connecticut's Uncompensated Care Pool Act) which imposed additional surcharges on hospital rates to reimburse hospitals for providing uncompensated care and granted discounts to a certain class of payers. Relying in part on the decision of our Court of Appeals in *Rebaldo v. Cuomo*, 749 F.2d 133 (2d Cir.1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), the *United Wire* court held that New Jersey's uncompensated care statute was not preempted by ERISA because "we are here dealing with a statute of general applicability that is designed to establish prices to be paid for hospital services, which does not single out ERISA plans for special treatment, and which functions without regard to the existence of such plans." 995 F.2d at 1192.

This court disagrees that statutes such as New Jersey's uncompensated care law or the Connecticut act at issue here function without regard to the existence of ERISA plans. *See The Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 721 (2d Cir.1993, as amended Jan. 14,

---

**4.** Our Court of Appeals has noted data which suggest that the number may even be higher. *See The Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 711 (2d Cir.1993). ("Eighty-eight percent of non-elderly Americans have private health insurance through their employee welfare benefit plans.").

**5.** This is true even though the Act, in its current incarnation, only refers to patients and not to ERISA plans. In general, ERISA plans will pay the assessments on behalf of individual participants. Even if a particular ERISA plan refuses to cover the assessment, any payment received from the plan for other hospital services will be applied first to cover the assessment and then to the remainder of the bill. *See* Conn.Gen.Stat. § 19a–168b(c)(6), as amended by Conn.P.A. 93–229, § 11. This accounting device insures that the assessment will be paid out of ERISA funds

regardless of whether the plan agrees to assume the cost, and regardless of whether the remainder of the bill is ultimately collected from the individual participant.

**6.** Section 19a–168m, as amended by P.A. 93–44, § 17, provides in relevant part: "In the event that the final result of litigation brought pursuant to the federal Employee Retirement Income Security Act of 1974 (ERISA) ... is that any class of charges for patient care services except those rendered to patients whose services are covered by medical assistance, Medicare, and CHAMPUS, is exempted from the assessment, the operation of the pool shall be terminated as soon as practicable but no later than one year after the date of the final court decision." Conn.Gen.Stat. § 19a–168m, as amended by Conn.P.A. 93–44, § 17.

1994) (declining to follow *United Wire* because the Court of Appeals for the Third Circuit read ERISA's preemption clause too narrowly and citing *United Wire*, 995 F.2d at 1196–1203 (Nygaard, J., dissenting)).[7] Even if such statutes do not explicitly single out ERISA plans for special treatment, they surely depend on those plans for their effectiveness. In sum, we clearly have here the connection between the statute and ERISA plans required to support preemption.

### 2. Substantial Economic Effect on ERISA Plans

Connecticut's Uncompensated Care Pool Act is also preempted by ERISA because it imposes a substantial economic burden on ERISA plans. In *Travelers*, 14 F.3d at 711, the Court of Appeals held that state-imposed hospital surcharges which substantially increase the cost to ERISA plans of providing health benefits were preempted by ERISA. *Travelers* involved three surcharges imposed by the state of New York on certain hospital charges. First, insurance carriers of patients covered by any form of health plan other than Blue Cross/Blue Shield, a health maintenance organization ("HMO"), or governmental insurance were required to pay an additional 13% surcharge on hospital services. *Id.* at 712. The declared purpose of this surcharge, which was retained by the hospitals, was to make commercial insurers less competitive with Blue Cross/Blue Shield, thereby encouraging more employers and ERISA plans to subscribe to those insurers. In addition to the 13% surcharge, New York law imposed an 11% surcharge on commercial insurers and an assessment of up to 9% on HMOs which fail to enroll a target number of Medicaid-eligible persons. *Id.* at 712. Unlike the 13% surcharge, the proceeds of these surcharges were paid directly into a statewide pool. While the 11% surcharge served the same purpose as the 13% sur-

charge, the primary purpose of the 9% assessment was to encourage HMOs to enroll Medicaid recipients in order to reduce the costs of the Medicaid programs.

The *Travelers* court held that the three surcharges "related to" ERISA plans because they imposed "a significant economic burden" on those plans. 14 F.3d at 721.[8] The court reasoned that this economic effect was sufficient to trigger ERISA preemption because it "force[s] ERISA plans to increase either plan costs or reduce plan benefits," *id.* at 720, and thus has "an impermissible impact on ERISA plan structure and administration." *Id.* at 719.

Although the statute in the instant case differs in intended purpose from the New York surcharges, the effect on ERISA plans is the same—plans in Connecticut must either increase costs or reduce benefits. Based on the amount of money which the Fund has placed in escrow since the effective date of the Act, the plaintiffs estimated at oral argument that the Act has already increased plan costs by millions of dollars. Furthermore, the Fund asserts that it has had to reduce benefits in part as a result of the Act. These economic effects are sufficient to trigger ERISA preemption.

The defendants claim that the Fund would have incurred these costs regardless of the Act because, under a free-market system, hospitals would have shifted these costs to paying patients anyway. The court does not agree that the Fund would have necessarily incurred the same level of costs with or without the Act. Without the Act, it is possible that the Fund could have reduced costs by negotiating group discounts for uncompensated care or by encouraging participants to choose hospitals with low uncompensated care costs.[9] The defendants conceded at oral

---

**7.** The court also questions the Third Circuit's reliance on *Rebaldo*, in light of the subsequent treatment of that case by the Supreme Court and our Court of Appeals. *See infra* at 197; *Travelers*, 14 F.3d at 721 (declining to follow *United Wire* because of its reliance on *Rebaldo* ).

**8.** The *Travelers* court also found that the surcharges "related to" ERISA plans because they "purposely interfere with the choices that ERISA

plans make for health care coverage" by encouraging subscription to Blue Cross/Blue Shield over other insurers. *Travelers*, 14 F.3d at 719.

**9.** Because urban hospitals treat larger numbers of non-paying patients, their costs of uncompensated care are higher than those of suburban hospitals. Thus, by encouraging participants to use suburban hospitals rather than urban hospi-

argument that the Act effectively prohibits these cost reduction measures.

Furthermore, it is pure speculation whether the private system of shifting costs to paying patients would have continued in the absence of the Act. Quite possibly, the state legislature would have enacted some other scheme to redistribute the costs of uncompensated care—for example, a system of reimbursing hospitals from the state's general funds—which might have actually reduced costs to ERISA plans. In any event, the court cannot agree with the defendants that a statute which imposes millions of dollars of fixed costs on ERISA plans does not have substantial economic impact on those plans.[10]

Even assuming that the Act increases costs, the defendants question the propriety of resting a finding of preemption on this ground, and on the *Travelers* decision in particular. According to the defendants, *Travelers* represents an unwarranted departure from *Rebaldo*. The court disagrees. To the extent that the *Travelers* court departed from *Rebaldo*, such a departure was fully justified and—in any event—this court is bound to follow the law of our Circuit as it stands today.

*Rebaldo* involved a New York statute that established rate ceilings on inpatient charges, thus preventing ERISA plans from negotiating discounts for hospital services. 749 F.2d at 136. The Court of Appeals held that this statute was not preempted by ERISA because it was a statute of general application which did not "purport to regulate" ERISA plans. *Id.* at 137–38. Furthermore, the *Rebaldo* court reasoned that any economic connection the statute had with ERISA plans was too tenuous, remote or peripheral to support a finding of preemption. *Id.* at 138–39. In particular, the court observed that "the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated." *Id.* at 139.

The *Travelers* court expressly rejected the holding and economic rationale of *Rebaldo*. *Travelers*, 14 F.3d at 719. Even before *Travelers* was decided in late 1993, it was questionable whether *Rebaldo* remained good law. The Supreme Court had discredited *Rebaldo* in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 141–42, 111 S.Ct. 478, 484–85, 112 L.Ed.2d 474 (1990), explicitly rejecting the notion that a statute must "purport to regulate" ERISA plans in order to fall within the ambit of ERISA's preemption clause. *See also Smith v. Dunham–Bush, Inc.*, 959 F.2d 6, 9 n. 3 (2d Cir.1992) (questioning the continued vitality of *Rebaldo* in light of *Ingersoll–Rand*); *Travelers*, 14 F.3d at 719 ("We have little difficulty agreeing with the district court that *Rebaldo's* fundamental premise was rejected by the Supreme Court [in *Ingersoll–Rand* ]."). Furthermore, in the wake of *Ingersoll–Rand*, the Court of Appeals had reversed field. *See General Electric Co. v. New York Dept. of Labor*, 891 F.2d 25, 29–30.(2d Cir.1989), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990) (generally applicable statute governing labor costs that imposed upon ERISA plans indirect financial and administrative burdens preempted by ERISA).

The defendants nonetheless argue that *Rebaldo* is still valid for the proposition that a statute of general application which does not affect the structure, administration, or type of benefits provided by an ERISA plan is not preempted even if it has some economic impact on ERISA plans. *See Rebaldo*, 749 F.2d at 139. Assuming *arguendo* that the defendants are correct, this proposition is reconcilable with the central holding of *Travelers:* a statute of general application is preempted when it has a *substantial* economic impact on ERISA plans; such an impact, almost by definition, *does* affect the structure and administration of ERISA plans by increasing plan costs or causing a reduction in

---

tals, the Fund could reduce the amount of uncompensated care costs it incurred.

**10.** Even the Court of Appeals for the Third Circuit in *United Wire* conceded that uncompensated care statutes like the one in the instant case "may increase the charges billed to ERISA plan participants for hospital services." *United Wire*,

995 F.2d at 1193. The *United Wire* court simply concluded that this effect was too tenuous and remote to trigger ERISA preemption—a conclusion with which this court disagrees in light of *Travelers*, a decision by our own Court of Appeals.

**198**

plan benefits. *See Travelers,* 14 F.3d at 720. Indeed, the *Travelers* court acknowledged that where the economic impact of a generally applicable state statute is *"de minimis,"* the statute will avoid ERISA preemption. *Id.* at 720.

In sum, under *Travelers,* an economic impact which is sufficient to affect the structure or administration of ERISA plans is sufficient to trigger ERISA preemption. Since we have such an effect here, the Connecticut Act is preempted.

### 3. Impairment of Federal Law

In a final attempt to avoid preemption, the defendants argue that a finding of ERISA preemption is prohibited by section 514(d) of ERISA, which provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States...." 29 U.S.C. § 1144(d). According to the defendants, a finding of preemption would "impair" the operation of the Medicaid Act, 42 U.S.C. § 1396 *et seq.,* and the Medicare Act, 42 U.S.C. § 1395 *et seq.* The court disagrees.

█ Because of the intended breadth of the preemption clause, the Supreme Court has cautioned against applying section 514(d) too expansively. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 104, 103 S.Ct. 2890, 2903, 77 L.Ed.2d 490 (1983). As the Court stated, "Congress applied the principle of pre-emption 'in its broadest sense to foreclose any non-Federal regulation of employee benefit plans,' creating only very limited exceptions to pre-emption." *Id.* (quoting Cong.Rec. 29197 (1974) (remarks of Rep. Dent)). Accordingly, section 514(d) should not be construed as a "general savings clause" but reserved for those state laws "upon which federal laws depend for their enforcement." *Id.*

█ Under the Medicaid Act, states may use both "taxes of general applicability"[11] and health care-related taxes to generate revenues for medical assistance payments to hospitals that qualify for federal reimbursement. *See* 42 U.S.C. § 1396a(t) (taxes of general applicability); 42 U.S.C. § 1396b(w) (health care-related taxes). Even if, as the parties agree, the assessment under Connecticut's Uncompensated Care Pool Act is a valid health care-related tax as that term is defined by the Medicaid Act,[12] *see* Memorandum in Opposition to Plaintiffs' Motion and in Support of Cross–Motion for Summary Judgment by Defendant Steven J. Bongard in his Official Capacity as Chairman of the Commission on Hospital and Health Care (filed June 2, 1993) at 29–30; Plaintiffs New England Health Care Employees Union District 1199 and Nina Milner's Reply Brief (filed June 28, 1993) at 16, a finding of preemption would not "impair" the operation of the Medicaid Act. Nothing in the Medicaid Act requires states to impose health care-related taxes which pass the costs of uncompensated care onto paying patients. Furthermore, such taxes are not the exclusive means of implementing the statute—indeed, states may impose a variety of taxes to raise revenues, such as real estate taxes, income taxes, or sales taxes of general applicability. Since the Medicaid Act does not depend on statutes like the Act for its enforcement, it would not be "impaired" by a finding of preemption in the instant case.

█ Likewise, a finding of preemption in the instant case would not "impair" the Medicare Act. The Medicare Act authorizes the Secretary of Health and Human Services to utilize rates set by a state hospital reimbursement control system in lieu of the rates that would otherwise be set in accordance with Medicare rate-setting principles. *See* 42 U.S.C. § 1395ww(c)(1).[13] As with the

---

11. The phrase "general applicability" has a different meaning for purposes of ERISA and Medicaid. A tax of "general applicability" for Medicaid purposes is a tax which applies to services other than health care services. *See* 42 U.S.C. § 1396a(t). For ERISA purposes, a law of general applicability is one which does not treat ERISA plans differently from non-ERISA plans. *See Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 830, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988).

12. The six percent sales tax, by contrast, is a tax of general applicability that has been extended to hospital services.

13. Section 1395ww(c)(1) provides in relevant part: "The Secretary may provide, in his discretion, that payment with respect to services provided by a hospital in a State may be made in accordance with a hospital reimbursement control system in a State, rather than in accordance with other provisions of this title...."

Medicaid Act, the Medicare Act does not mandate the use of health care-related taxes that shift the costs of uncompensated care onto paying patients. Since there are other ways of generating Medicare revenues, a finding of preemption would not "impair" the Medicare Act.[14]

For all the foregoing reasons, the Uncompensated Care Pool Act is preempted by section 514(a) of ERISA.

## B.

The defendants also contend that the Uncompensated Care Pool Act is preempted by the NLRA. Inasmuch as the court has already determined that the Act is preempted by ERISA, it need not reach the question of preemption under the NLRA.

## CONCLUSION

Based on the full record, including the oral arguments of counsel, and for the reasons stated above, it is hereby ORDERED that:

1. The Motion for Summary Judgment of Plaintiffs New England Health Care Employees Union District 1199, SEIU AFL-CIO, and Nina Milner (filed Mar. 30, 1993) (doc # 33) is GRANTED;

2. The Plaintiff New England Health Care Employees Welfare Fund's Motion for Summary Judgment (filed Sept. 1, 1993) (doc # 87) is GRANTED.

3. The Defendant Steven J. Bongard's Motion for Summary Judgment (filed June 2, 1993) (doc # 53) is DENIED;

4. The Amended Motion for Summary Judgment of Defendants Mount Sinai Hospital and Connecticut Hospital Association (filed Sept. 1, 1993) (doc # 86) is DENIED;

5. The defendant Chairperson of the Commission on Hospitals and Health Care is enjoined from enforcing the Act against plaintiff Fund and/or members of the certified plaintiff class. Absent a contrary showing by any party, a reasonable manner for the Commission to comply with this order would be to direct hospitals to remove the "putative uncompensated care charges," as that phrase is defined by paragraph 1(c) of the Consent Order entered in this action on August 19, 1993,[15] from a class plaintiff's gross hospital charges;

6. Defendant Mount Sinai Hospital and other acute care hospitals in the state of Connecticut which have executed certifications as "Signatory Hospitals," as that term is defined in paragraph 1(a) the Consent Order,[16] are enjoined from including in hospital bills incurred by patients who are participants or beneficiaries of the Fund charges

---

14. The plaintiffs argue that far from impairing the Medicare Act, a finding of preemption is consistent with section 1395x(v)(1)(A)(i) of that statute, which provides in relevant part that the Secretary's regulations shall "take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter *will not be borne by individuals not so covered*, and the costs with respect to individuals *not so covered will not be borne by such insurance programs....*" 42 U.S.C. § 1395x(v)(1)(A)(i) (emphasis added). According to the plaintiffs, this section manifests Congress' intent to prohibit the shifting of Medicare costs to non-Medicare patients. The defendants contend that this is an overly broad reading of section 1395x(v)(1)(A)(i). The court need not reach the question of whether a finding of preemption is consistent with this provision of the Medicare Act. All the court is required to determine is whether such a finding "impairs" the Medicare statute—which it clearly does not.

15. Paragraph 1(c) of the Consent Order defines "putative uncompensated care charges" as "hospital charges attributable to hospital costs of providing uncompensated and undercompensated care, which the plaintiff class and the Health Fund alleges have been unlawfully charged. Putative uncompensated care charges shall be deemed equal to 30.5% of all hospital charges, unless and until otherwise ordered by the Court."

16. Paragraph 1(a) of the Consent Order defines "Signatory Hospitals" as "all acute care hospitals in the state [of Connecticut] that have consented to be bound by the terms of the agreement outlined in this Order. Evidence of this consent is shown by a Certification, substantially in the form of Exhibit A, attached hereto, filed with the Court by each Signatory Hospital." All thirty-four acute care hospitals in the state of Connecticut have executed certifications as Signatory Hospitals. *See* Supplemental Notice Concerning Certifications of Signatory Hospitals (filed Sept. 2, 1993).

which exceed those authorized by the Commission acting in accordance with this ruling;

7. In accordance with paragraph 9(a) of the Consent Order, the Escrow Agent shall disburse to the Fund the withheld amounts, plus any accrued interest thereon, and the Signatory Hospitals shall reimburse the Fund the difference between the "putative uncompensated care charges" and "the uncompensated care pooled amount," as that phrase is defined in paragraph 1(d) of the Consent Order,[17] to the extent that the amount of that difference was paid to the Signatory Hospitals by the Fund in accordance with paragraph 7 of the Consent Order.[18] No interest shall be deemed to accrue or be paid with respect to this reimbursement. The disbursement by the Escrow Agent and the reimbursements by the Signatory Hospitals shall be made within thirty days of this ruling, unless otherwise agreed by the parties; and

8. For the period from July 8, 1992 (the date on which the Fund began to place in escrow amounts attributable to the Act) through August 19, 1993 (the date on which the court entered the Consent Order), defendant Connecticut Hospital Association, through its members, shall provide reimbursement to the Fund and to members of the plaintiff class of any and all money collected by those hospitals for charges in excess of those allowed under this ruling.

It is so ordered.

---

17. Paragraph 1(d) defines the "uncompensated care pooled amount" as "the percentage of hospital charges in effect at any given time (regardless of whether such amount is denominated an assessment, a sales tax or some other name)·that hospitals in Connecticut are required, in accordance with the terms of the Uncompensated Care Pool Statute, Conn.Gen.Stat. § 19a–168 *et seq.*, and related statutes, to remit to the Commission on Hospitals and Health Care (e.g., 8.4% as of October 1, 1992)."

18. Paragraph 7 of the Consent Order provides: "During the period of time this Order is in effect,

the Health Fund agrees, with respect to services rendered to class members on or after August 1, 1993 (i) to reduce the percentage of withheld funds from the amount of putative uncompensated care charge to the uncompensated care pool amount (e.g., from 30.5% of otherwise covered charges for services rendered on August 1, 1993 to 8.4% of such charges) for all Signatory Hospital charges, and (ii) to deposit, no less frequently than once a week, the uncompensated care pooled amount in a separate account maintained by the Escrow Agent."'