Sebastian REBALDO, as Chairperson of the Board of Trustees of the United Optical Workers Insurance Fund, Plaintiff-Appellee,

v.

Mario CUOMO, Governor of the State of New York; and David Axelrod, Commissioner of Health of the State of New York, Defendants-Appellants.

Cal. No. 1466, Docket 84–7388.

United States Court of Appeals, Second Circuit.

Argued June 14, 1984.

Decided Nov. 26, 1984.

Judith A. Gordon, Asst. Atty. Gen., New York City, (Robert Abrams, Atty. Gen. of the State of New York, New York City, of Counsel), for defendants-appellants.

Susan Martin, New York City (Sipser, Weinstock, Harper, Dorn & Leibowitz, I. Philip Sipser, Richard Dorn and Jerome Tauber, New York City of Counsel), for plaintiff-appellee.

Robert A. Bicks, New York City (Breed, Abbott & Morgan, Alan C. Drewsen and Daphne E. Telfeyan, New York City, of Counsel), for amicus curiae Blue Cross and Blue Shield of Greater New York.

Wood, Lucksinger & Epstein, New York City (George Kalkines, Fredrick I. Miller and William S. Bernstein, New York City, of Counsel), for amicus curiae The Hospital Ass'n of New York State.

Before FRIENDLY, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York (Conner, J.), which invalidated section 2807–a(6)(b) of New York's Public Health Law to the extent it prohibits a hospital from establishing inpatient charges for self-insured employee benefit plans that are other than the charges authorized by the section. The provisions of the statute thus invalidated precluded self-insured employee benefit plans such as the United Optical Workers Insurance Fund (United) from negotiating discount rates with hospitals similar to the rates permitted for payors such as Blue Cross, which operate under Article IX-C of New York's Insurance Law.

■ In holding as it did, the district court adopted appellee's contention that New York's right to set hospital rates chargeable to employee benefit plans was

preempted by section 514(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a), which states with certain exceptions that the provisions of ERISA shall supersede State laws insofar as they "relate" to any employment benefit plan. For reasons hereafter stated, we believe that appellee's contention should have been rejected.

During the past several decades, the cost of hospital care has spiraled. *See Greater New York Hospital Association v. Blum,* 634 F.2d 668, 669 (2d Cir.1980); *California Welfare Rights Organization v. Richardson,* 348 F.Supp. 491, 496 (N.D.Cal.1972). In 1983, approximately $8 billion was spent on inpatient hospital care in the State of New York alone. Because approximately two-thirds of this amount was paid by Medicaid and Medicare, both the federal and state governments have sought to develop systems of cost control. However, since Medicaid controls have been more exacting than those of Medicare, administrative attempts to contain hospital costs have been more successful in the former than in the latter.

Medicaid is a joint state and federal program designed to provide medical care to those who otherwise could not afford it. *Hospital Association of New York State, Inc. v. Toia,* 577 F.2d 790, 792 (2d Cir. 1978). New York State is one of the voluntary participants in this plan, which it administers in compliance with applicable federal statutes and regulations. In return for such compliance, the federal government has obligated itself to fund up to 60% of the cost of New York's program. 42 U.S.C. § 1396a(a)(2).

Almost from the time when New York opted to participate in the Medicaid program, *see* N.Y.Soc.Serv.Law § 363–a, the State has been engaged in a continuing attempt to keep hospital costs within reasonable limits. Prior to 1970, New York reimbursed hospitals on the basis of their actual costs. In 1969, the State decided that this method was too costly and that, effective January 1, 1970, payments would be made in accordance with predetermined rate schedules that reasonably were related to the costs of the services performed. *See Hospital Association of New York State, Inc. v. Toia, supra,* 577 F.2d at 792 n. 1; *National Union of Hospital and Health Care Employees v. Carey,* 557 F.2d 278, 279–80 (2d Cir.1977). Although modified by subsequent legislation, that is the basic manner in which payments are made today.

Medicare, which was established to provide medical care to the elderly, is funded entirely by the federal government. Traditionally, states have played no role in setting Medicare rates or handling Medicare payments. *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329, 334 (5th Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). Thus, in contrast to the prospective rate setting method adopted for Medicaid in New York, Medicare continued until 1982 to calculate hospital entitlements on the basis of costs computed at the end of each fiscal year.

As early as 1967, however, Congress realized that "the rigid commitment to a cost basis of reimbursement may provide insufficient incentive for participating providers of services to furnish health care economically and efficiently", and concluded that bases of Medicare reimbursement other than the cost method should be explored experimentally. S.Rep. No. 744, 90th Cong., 1st Sess. *reprinted in* 1967 U.S. Code Cong. & Ad.News 2834, 2905. This realization led to the enactment of Pub.L. No. 90–248, tit. IV, § 402(a), (b), 81 Stat. 930, 931, the precursor of 42 U.S.C. § 1395b–1. In substance, section 402(a), (b) authorized the Secretary of Health, Education and Welfare to develop and engage in experiments under which hospitals would be reimbursed in a manner leading to increased efficiency without any impairment of quality. Section 402(c) of the 1967 statute amended section 1875(b) of the Social Security Act, now 42 U.S.C. § 1395*ll* to provide that the Secretary should submit an annual report to Congress concerning the experiments and demonstration projects authorized by Section 402(a), (b).

Section 222 of Pub.L. No. 92–603, tit. II, 86 Stat. 1390, enacted in 1972, continued and enlarged upon the Secretary's authority to conduct experiments and demonstration projects. Anticipating that Medicaid and private insurers might participate in these experiments, Congress expressed its intent that "Medicaid and private funds would also be used proportionately when medicaid and private programs participate in the project." H.R.Rep. No. 231, 92d Cong. 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4989, 5068. *See* 42 U.S.C. § 1395b–1(a)(2).

By the time Congress decided in 1983 to convert Medicare substantially to a system of predetermined prospective rates, *see* Pub.L. No. 98–21, tit. VI, § 601, 97 Stat. 149 (1983), *codified at* 42 U.S.C. § 1395ww(d), (e), (f), demonstration projects had been established in Maryland, Massachusetts, New Jersey, and New York. Section 603(b) of the 1983 Act, which may be found in the Historical Note following 42 U.S.C. § 1395b–1, provided that "the amendments made by this title shall not affect the authority of the Secretary to develop, carry out, or continue experiments and demonstration projects." In commenting on section 603(b), the report of the House Ways and Means Committee stated:

> Your Committee believes that State cost containment systems have proven effective in reducing the cost of hospital care and that such systems should be encouraged. It is the intent of this provision that the Secretary continue medicare waivers for States which currently have effective demonstration projects and provide an opportunity for new States to develop sound approaches to cost containment. State systems covering all payors have proven effective in reducing health costs and should be encouraged. Such State programs may be useful models for our national system.

H.R.Rep. No. 25, 98th Cong., 1st Sess. 147–48, *reprinted in* 1983 U.S.Code Cong. & Ad.News 143, 219, 366–67.

The Committee's report continues:

> Your Committee bill provides that, upon the request of the State, the Secretary is required to modify the terms of the New York and Massachusetts waivers to eliminate the requirement that the State rate of increase in medicare hospital costs be below the national rate.
>
> . . . .
>
> Under your Committee's bill and under the current demonstration authority of the Secretary, State systems are required to meet a savings test that is related to medicare.

*Id.*

The statute invalidated below is part of New York's experiment and demonstration project, a three-year program beginning January 1, 1983. The program was approved by the Secretary on December 21, 1982, pursuant to the authority granted by section 402(a). In pertinent part, this plan provides that the State Commissioner of Health shall establish for each hospital an "inpatient revenue cap", i.e., the maximum amount of inpatient revenue the hospital will be authorized to receive for services during a twelve-month period, N.Y.Pub. Health Law § 2807–a(1), with additional allowances being made for bad debts and charity care, *id.* at (4). Each general hospital is required to establish a charge schedule sufficient to generate the inpatient revenue authorized by the revenue cap, with a proviso that the rate for Article IX–C corporations such as Blue Cross shall be at a discount of from 12% to 15% below that of other non-governmental payors such as United. The statute excepts from this rate differential health maintenance organizations certified under Article 44 of New York's Public Health Law and self-insured and self-administered groups that had hospital rate contracts in effect on May 1, 1982. *Id.* at (6). Because United is not an Article 44 health maintenance organization and had no rate contract in effect on May 1, 1982, it did not fall within the excepted group.

Appellee commenced this action on December 1, 1983. In addition to his claim of preemption under ERISA, appellee alleged

that subsection 6(b) unconstitutionally impaired the obligation of contracts, burdened interstate commerce, denied United equal protection of the law, was void and preempted by the Constitution's supremacy clause, and established anti-competitive price discrimination in violation of the federal antitrust laws. Because the district court held that the rate setting provisions of the statute, as they applied to self-insured employee benefit plans, were preempted by ERISA, the court found it unnecessary to reach appellee's other contentions. The sole issue before this Court, therefore, is whether Congress, in enacting ERISA, intended to preclude the subsequent adoption of experimental and demonstration projects, such as the one at issue herein, to the extent that those plans prescribe hospital rates chargeable to self-insured employee benefit plans.

 Appellants' principal argument on appeal is that the setting of rates that hospitals must charge private payors, a group that includes employee benefit plans, does not "relate" to United's plan within the meaning of section 514(a). Appellee's initial response to this argument, albeit a response made almost in passing, is that it was not made in the district court and therefore should not be heard here. Although generally this Court will not consider an issue not passed on below, *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), we may, under proper circumstances, make exceptions to this rule, *id.* at 121, 96 S.Ct. at 2877; *Chico v. Schweiker*, 710 F.2d 947, 952 (2d Cir.1983); *see also Davis v. Musler*, 713 F.2d 907, 917 (2d Cir.1983) (Van Graafeiland, J., concurring) and cases there cited.

Because the district court examined the issue of relationship in some detail and because that court's decision has broad legal ramifications and concerns the validity of a State statute, we think this is a case for such an exception.

Moreover, both parties as well as *amici* have fully briefed and argued before this Court whether this New York law "relates to" ERISA plans within the meaning of § 514(a), and the issue is solely one of law the determination of which could not be altered by appellee's producing additional evidence.

 Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that "the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." In the definitional section, 29 U.S.C. § 1144(c)(2), Congress defined the term "State" for ERISA preemption purposes as follows:

> The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

Thus, a state law must "purport[ ] to regulate, ... the terms and conditions of employee benefit plans" to fall within the preemption provision. Appellee contends that this phrase should not be read to impose any special limitation in determining whether the hospital rate regulation in the instant case relates to United.[1] We disagree. As the district court quite properly recognized, the Supreme Court has given

---

1. Appellee relies for this argument on a report issued after the passage of ERISA by the House Committee on Education and Labor that concluded that the phrase "which purports to regulate" modifies "agency or instrumentality" only and does not modify the term "State." H.R.Rep. No. 1785, 94th Cong., 2d Sess. 47–48 (1977). Such reports, although often persuasive, are not binding. We reject this Report's analysis as lacking even persuasive authority. In *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981), the Supreme Court held that the phrase "directly or

indirectly" modified both "State" and "agency or instrumentality." This entirely sensible reading follows naturally the structure of the sentence and its punctuation, and we see no reason to read the immediately preceding clause, "which purports to regulate," any differently. Thus, even without the decision in *Alessi*, we would read the phrase "which purports to regulate, ... the terms and conditions of employee benefit plans" as modifying the term "State." *Accord, Lane v. Goren*, 743 F.2d 1337, 1339 (9th Cir.1984).

the term "relate" as used in ERISA a broad and liberal construction. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 2899–900, 77 L.Ed.2d 490 (1983). However, the preemptive scope of ERISA is neither all-encompassing, *Lane v. Goren,* 743 F.2d 1337, 1339 (9th Cir.1984), nor unlimited, *Savings and Profit Sharing Fund of Sears Employees v. Gago,* 717 F.2d 1038, 1040 (7th Cir.1983). ERISA does not invalidate those State statutes whose effect on pension plans is simply tangential in nature. *Shaw v. Delta Air Lines, Inc., supra,* 103 S.Ct. at 2901 n. 21; *American Telephone & Telegraph Co. v. Merry,* 592 F.2d 118, 121 (2d Cir.1979). This conclusion follows as a matter of common sense from the fact that ERISA plan members and managers are bound to engage in myriad transactions that Congress never considered when it drafted § 514. A preemption provision designed to prevent state interference with federal control of ERISA plans does not require the creation of a fully insulated legal world that excludes these plans from regulation of any purely local transaction.

■ The containment of hospital costs is an exercise of a State's police powers, which should not be superseded by federal regulations unless that was the clear intent of Congress. *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981); *Massachusetts Nursing Association v. Dukakis,* 726 F.2d 41, 44 (1st Cir.1984); *see Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). Accordingly, a State's promulgation of hospital rate schedules should not be found to "relate" to "the terms and conditions of employee benefit plans" unless this conclusion is unavoidable. *See Alessi v. Raybestos-Manhattan, Inc., supra,* 451 U.S. at 522, 101 S.Ct. at 1905.

■ It is clear that ERISA preempts state laws that require or forbid the provision of a certain kind of benefit. *See, e.g., Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323, 329–30 (2d Cir.1982), *aff'd sub nom. Arcudi v. Stone & Webster Engineering Corp.,* —— U.S. ——, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983) (state law requires provision of health insurance to former employee receiving workmen's compensation). It is equally clear that ERISA does not preempt every state law that incidentally touches pension plans through its effect on individuals. *See, e.g., American Tel. & Tel. Co. v. Merry, supra,* 592 F.2d at 123–26 (garnishment of pension benefits to collect alimony and child support). As said in *Shaw v. Delta Air Lines, Inc., supra,* 103 S.Ct. at 2901 n. 21: "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." New York's decision to regulate the amounts hospitals can charge falls within this description. Appellee's suggestion that, because this regulation affects pension plans in their dealings with hospitals by increasing their costs of doing business, it must be found preempted, proves altogether too much. As the court observed in *Lane v. Goren, supra,* at 1340:

> That argument does not withstand scrutiny. So too, for example, do State laws and municipal ordinances regulating zoning, health, and safety increase the operational costs of ERISA trusts, but no one could seriously argue that they are preempted.

*See also American Progressive Life & Health Insurance Co. v. Corcoran,* 715 F.2d 784, 787 (2d Cir.1983).

■ The purchase of hospital service is like the purchase of public utility service, or of any other service or commodity whose price is controlled by the State. Insofar as the regulation of hospital rates affects a plan's cost of doing business, it also may be analogized to State labor laws that govern working conditions and labor costs, to rent control laws that determine what employee benefit plans pay or receive for rental property, and even to such minor costs as the Thruway, bridge and tunnel tolls that are charged to plans' officers or employees. In short, if ERISA is held to invalidate every State action that may in-

crease the cost of operating employee benefit plans, those plans will be permitted a charmed existence that never was contemplated by Congress. Where, as here, a State statute of general application does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated.[2]

Moreover, such indirect economic impact as may result from State control over hospital rates does not run counter to ERISA's aim of national uniformity in plan regulation. *See Shaw v. Delta Air Lines, Inc., supra,* 103 S.Ct. at 2890 n. 20. There is no valid reason why employee benefit plans cannot be subject to nationally uniform supervision despite dissimilarities in their costs of doing business. Indeed, if statutes such as section 2807–a(6)(b) of New York's Public Health Law are held to be preempted by ERISA, every hospital will be able to set its own rates for ERISA plans, and appellee does not contend that these rates are, or will be, uniform, even as between hospitals in the same locality. Lack of uniformity is not a valid argument for preemption of New York's statute.

The author of this opinion, writing only for himself and not his colleagues, who take no position on the issue, believes that New York's experimental and demonstration project, incorporated in section 2807–a, also is exempted from the preemptive provisions of ERISA by section 514(d) of that Act, which provides that nothing in ERISA shall be construed to "impair ... any law of the United States ... or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d).

Medicaid has been described correctly as a "cooperative endeavor", a "cooperative program of shared financial responsibility" between the states and the federal government. *Harris v. McRae,* 448 U.S. 297, 308–

09, 100 S.Ct. 2671, 2683–84, 65 L.Ed.2d 784 (1980). It is "one of the 'cooperative federalism' welfare programs administered jointly by state and federal governments." *Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056, 1061 (D.Mass.1975). *See also King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2132, 20 L.Ed.2d 1118 (1968). A federally authorized experimental and demonstration project that incorporates both Medicaid and Medicare certainly is no less a cooperative undertaking.

As already pointed out, Congress authorized the Secretary of Health, Education and Welfare "to develop and engage in experiments and demonstration projects ... to determine whether the rates of payment ... for health care services, approved by a State for purposes of the administration of one or more of its laws, when utilized to determine the amount to be paid for services furnished in such State under the health programs established by this chapter, would have the effect of reducing the costs of such programs without adversely affecting the quality of such services." 42 U.S.C. § 1395b–1(a)(1)(C). This statute unambiguously vests the Secretary with authority to engage in such experiments. *Blue Cross Association v. Harris,* 622 F.2d 972, 976 (8th Cir.1980).

> It is a commonplace of statutory construction that a legislative grant of power carries with it the right to use the means and instrumentalities necessary to the beneficial exercise of that power.

*Id.* at 978. *See also Health Care Service Corp. v. Califano,* 601 F.2d 934, 935 (7th Cir.1979); *California Welfare Rights Organization v. Richardson, supra,* 348 F.Supp. at 493, 495.

In fact, Congress did more than merely authorize the Secretary to approve New York's demonstration project. In section 603(b)(1) of the 1983 Act, Congress ratified

---

**2.** The mere fact that section 2807 recognizes differences between groups, including "self-insured groups" like United, and tempers its treatment of these groups to reflect these differences, does not make it any the less a law of general application for preemption analysis.

*Cf. New York Tel. Co. v. New York State Dept. of Labor,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (New York unemployment benefit law that gives special treatment to striking employees is "a law of general application," and thus is not preempted by NLRA).

what the Secretary had done by authorizing the continuation of the established project. The program under review is not simply a New York undertaking; it is a cooperative undertaking of the state and federal governments.

The need for such experimental projects in the continually developing field of public health and assistance is obvious. "A purpose to determine whether and how improvements can be made in the welfare system is as 'legitimate' or 'appropriate' as anything can be." *Aguayo v. Richardson,* 473 F.2d 1090, 1109 (2d Cir.1973). *See California Welfare Rights Organization v. Richardson, supra,* 348 F.Supp. at 497. Indeed, the predetermined rate scheduling procedure that New York adopted for Medicaid in 1970 began its existence as an experimental or demonstration project with the approval of the Secretary and later was adopted as a permanent basis for payments. The above outlined history of the numerous congressional enactments authorizing experiments and demonstration projects shows the consistent intent of Congress that such experiments be conducted. When Congress gives authority with one hand, it ordinarily does not take it away with the other.

In attempting to control hospital charges, a State has the choice of setting rates for specific services, a procedure that is both cumbersome and expensive, or of prescribing a "revenue cap" for all services, a procedure that eliminates much of the administrative morass inherent in selective rate setting and gives hospitals some leeway in fixing specific charges. In order for the "revenue cap" concept to operate properly, a plan must provide, as New York's does, for an equitable apportionment of hospital costs among all payors, including the costs of bad debts and charity care. Indeed, the Medicare Act specifically prohibits the shifting of costs between Medicare and non-Medicare payors. 42 U.S.C. § 1395x(v)(1)(A). *See Greater New York Hospital Association v. Mathews,* 536 F.2d 494, 499 (2d Cir.1976); 10 N.Y.Admin.Code, tit. 10, § 86–1.11(b). Were the Secretary prevented from approving experimental reimbursement programs that attempt to regulate all sources of hospital inpatient revenue and equitably apportion responsibility for bad debt and charity care, the statutory mandate for such experimental programs would be impaired substantially.

In sum, the writer does not believe that Congress intended that ERISA would preempt a project of cooperative federalism, such as we have here, a project that was authorized and ratified by federal statute and is intended in substantial part to conserve federal funds.

The district court's judgment is vacated and the matter is remanded for further proceedings consistent with this opinion.