HARMON CITY, INC., a Utah corporation; and Terry Harmon, individually, Plaintiffs and Appellants,

v.

NIELSEN & SENIOR, a Utah professional corporation; Michael Gottfredson, an individual; Nielsen, Henriod, Gottfredson & Peck, a Utah professional corporation; Nielsen, Conder, Henriod & Gottfredson, a Utah professional corporation; W. Waldan Lloyd, an individual; D. Jay Curtis, an individual; and John or Jane Does I through VI, Defendants and Appellees.

NIELSEN & SENIOR, a Utah professional corporation; Michael Gottfredson, an individual; and D. Jay Curtis, an individual, Counterclaimants and Third-Party Plaintiffs,

v.

F. Ray GREEN; Lynda H. Green; Doreen Harmon; Irene M. Harmon; Richard H. Harwood; Niels Pedersen; Randy Buckner; Robert Morris; H. Sherwood & Company, a professional corporation; Kirton, McConkie & Poelman, a profes-

sional corporation; Brown, Smith & Hanna, a professional corporation; Robert Kent; Chester L. Murphy; John G. Wells; Chester Fassio; R. Brian De Haan; Robert L. Taylor; and Does I–X, individuals, Third–Party Defendants.

F. Ray GREEN and Lynda Green, Plaintiffs, Counterclaim Defendants, and Appellants,

v.

NIELSEN & SENIOR, a Utah professional corporation; Michael Gottfredson, an individual; and John or Jane Does I through X, Defendants, Counterclaim Plaintiffs, Third–Party Plaintiffs, and Appellees,

v.

Terry HARMON; Harmon City, Inc.; Doreen Harmon; Irene M. Harmon; Richard H. Harwood; Neils Pedersen; Randy Buckner; Robert Morris; H. Sherwood & Company, a professional corporation; Brown, Smith & Hanna, a professional corporation; Robert Kent; Chester L. Murphy; John G. Wells; Chester Fassio; R. Brian De Haan; Robert L. Taylor; and Does I–X, individuals, Third–Party Defendants and Appellees.

Nos. 940292, 940428.

Supreme Court of Utah.

Dec. 6, 1995.

Brinton R. Burbidge, Blake T. Ostler, Randy T. Austin, Salt Lake City, for Harmon City and Terry Harmon.

John K. Mangum, Robert A. Peterson, Jeffrey E. Nelson, Marvin D. Bagley, Craig W. Dallon, Salt Lake City, for Nielsen & Senior, Curtis, and Gottfredson.

Scott A. Call, Salt Lake City, for Lloyd George A. Hunt.

David W. Steffensen, Salt Lake City for the Greens.

Thomas S. Williamson, Jr., Allen H. Feldman, Nathaniel I. Spiller, Elizabeth Hopkins, Washington, DC, for amicus U.S. Department of Labor.

DURHAM, Justice:

Plaintiffs Harmon City, Inc. (HCI), and Terry Harmon (collectively the Harmons) appeal from the district court's grant of summary judgment in favor of defendants Nielsen & Senior, Michael Gottfredson, and D. Jay Curtis and the grant of a motion to dismiss in favor of W. Waldan Lloyd. Similarly, plaintiffs Ray and Lynda Green appeal from the district court's grant of summary judgment in favor of defendants Nielsen & Senior, Gottfredson, Lloyd, and Curtis (collectively the lawyers).[1] These cases arise out of legal advice the lawyers gave to the Harmons and Ray Green from 1976 to 1986 concerning investments which plaintiffs were considering on behalf of an employee benefit plan. Because these cases involve the same factual background and substantially similar legal issues, we have consolidated them on appeal. We reverse and remand.

Before reciting the facts, we note that when reviewing a grant of summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993). We state the facts in this case accordingly.[2] *See id.*

HCI owns and operates a chain of grocery stores in Utah and is the sponsor and administrator of the Harmon City, Inc. Profit Sharing Plan (the Plan). From 1976 to about 1985, Terry Harmon and Ray Green were trustees of the Plan. In addition to being a Plan trustee, Harmon was president, shareholder, and a director of HCI and a director and shareholder of Midwest Realty & Finance, Inc. (Midwest), a publicly held compa-

---

1. Gottfredson and Curtis are former employees of Nielsen & Senior, and Lloyd is a former employee of Nielsen, Henriod, Gottfredson & Peck.

2. One defendant, Lloyd, moved solely for dismissal under rule 12(b)(6). The trial court granted Lloyd's motion, and the Harmons appeal. When reviewing a grant of a motion to dismiss, "we accept the factual allegations in the complaint to be true and consider them and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff." *Hunsaker v. State*, 870 P.2d 893, 897–98 (Utah 1993). Accordingly, we state the facts in a light most favorable to the party against whom the rule 12(b)(6) motion was brought. *St. Benedict's Dev. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991).

ny that developed and marketed real property until about 1985. Ray Green, in addition to being a Plan trustee, was the secretary-treasurer, chief financial officer, and a director of HCI and president, general manager, and a director of Midwest. The Greens and the Harmons owned just under fifty percent of the Midwest stock, which was sufficient to effectively control Midwest. Harmon and his family members owned more than forty percent of HCI's stock. Likewise, Ray and Lynda Green, together with their children, owned more than forty percent of HCI's stock.

HCI retained the lawyers to perform legal services for HCI, Midwest, the Plan, and the Plan trustees, Harmon and Green. The lawyers also advised Green and Harmon individually. Gottfredson represented to the Harmons that he and other members of his law firm were experts on the Employee Retirement Income Security Act (ERISA). In about 1973, Gottfredson drafted the initial HCI Plan. In addition, the lawyers provided annual auditors' letters for both HCI and the Plan. Although the lawyers were neither Plan fiduciaries nor Plan administrators, both HCI and the Plan trustees frequently asked the lawyers whether the investments they were contemplating were legally permissible and sought general advice as to what types of investments they could legally make. The lawyers' advice, through Gottfredson, was not limited to ERISA issues; the lawyers gave advice regarding all laws that might impinge upon the appropriateness of Plan investments, including rules and regulations of the Securities and Exchange Commission (SEC) and various tax laws.

Following institution of the Plan, the Plan trustees asked Gottfredson whether it would be appropriate for the Plan to make "real estate loans." Gottfredson responded, "Yes, just make sure they are well secured and check the applicant's credit like a bank would." Gottfredson said nothing about the need to diversify the loans, nor did he comment on prohibitions of lending to parties-in-interest or the self-dealing restrictions contained in ERISA. According to the uncontested opinion of the Harmons' ERISA expert, Marc Gertner, Gottfredson's advice was

incorrect and fell below the standard of care for attorneys practicing ERISA law. In reliance on Gottfredson's advice that the Plan could make real estate loans as long as they were secured and the borrower had good credit, the Plan began to invest heavily in real-estate-secured loans to Midwest.

In 1977, Green specifically asked Gottfredson if it would be legally permissible for the Plan to make a $250,000 loan to Midwest and whether the Plan could purchase Midwest stock. Lloyd researched the issue. In a January 5, 1978, letter, Gottfredson responded:

> The loan will not constitute a prohibited transaction by the Profit Sharing Plan as long as the total of stock owned by Harmon City, Inc. and by the officers and directors and shareholders of Harmon City, Inc. is less than 50% of the outstanding voting stock of Midwest Realty Corporation or less than 50% of the total value of all classes of stock of Midwest Realty Corporation.

Gottfredson made no mention of other ways in which the loans from the Plan to Midwest could constitute breaches of fiduciary duties, diversification requirements, or self-dealing restrictions contained in ERISA, or that the loans could create potential liability for Plan trustees. In reliance on this legal advice, the Plan loaned $250,000 to Midwest and additional amounts from time to time thereafter. Periodically, Green would discuss with Gottfredson various Plan loans, including additional loans to Midwest. Plaintiffs allege that they would not have approved loans from the Plan to Midwest if the lawyers had advised them about additional ERISA provisions restricting such Plan investments.

In 1982, concerns arose about how the SEC would view Midwest's ownership of certain properties which were collateral for debts Midwest owed to the Plan. Gottfredson advised the Plan trustees that as long as the transfer did not involve a substantial amount or a majority of Midwest's assets and if appropriate Board approvals were obtained, the Plan could accept the properties as partial satisfaction of its loans to Midwest. Again, in giving such legal advice, Gottfredson made no mention of diversification, self-

dealing, prohibited transactions, or reasonable-person requirements of ERISA.

In the fall of 1983, the Plan auditors, Coopers & Lybrand, requested that Green obtain an opinion letter to the effect that the Harmon and Green families owned less than fifty percent of Midwest's stock. Green asked Gottfredson to prepare an opinion letter to this effect. The lawyers provided the opinion letter, which went beyond merely addressing whether the Harmon and Green family members owned fifty percent or less of Midwest's stock. It stated that as long as the Harmons and the Greens owned less than fifty percent of Midwest's stock, loans from the Plan to Midwest would not be prohibited by law. The November 23, 1983, opinion letter was drafted by Curtis and signed by Gottfredson.

In the summer of 1984, Gottfredson met with Harmon and Green to review the loans which HCI and the Plan had made to Midwest. After reviewing the loans, Gottfredson became concerned for the first time that the loans to Midwest from the Plan might have been prohibited under ERISA, and he advised the Plan trustees to transfer the properties securing the loans from Midwest to the Plan. The attempts to make the Plan whole were unsuccessful, and the Plan suffered losses even after the collateral transfers. Harmon and Green resigned as Plan trustees in 1986, and new trustees were appointed. The Plan, Harmon, Green, and HCI retained separate legal counsel. While representing plaintiffs prior to this time, the lawyers had failed to point out the conflict of interest arising from their simultaneous representation of HCI, the Plan, the Plan trustees, and Midwest.

According to Gertner, the Harmons' ERISA expert, the lawyers' repeated and consistent failure to properly advise the Plan trustees regarding "plan/party in interest prohibited transactions" described in 29 U.S.C. § 1106, fiduciary prohibited transactions described in 29 U.S.C. § 1106(b), diversification requirements described in 29 U.S.C. § 1104(a)(1)(C), and the "solely in the interest of" and "prudent man" provisions of 29 U.S.C. § 1104(a)(1)(B) was "flagrantly reckless, with willful and wanton disregard of the standard of care for attorneys practicing in this area of the law." In addition, according to Gertner's affidavit, Gottfredson's joint representation of HCI, the Plan, the Plan trustees, and Midwest likewise fell below the appropriate standard of care. The lawyers have provided no affidavit or evidence of any kind to rebut Gertner's affidavit.

In 1986, the Department of Labor (DOL) audited the Plan and found that the loans from the Plan to Midwest and the subsequent transfers back to the Plan were prohibited transactions under ERISA. In 1987, the DOL filed a lawsuit against HCI, Harmon, Green, and Midwest, alleging that the loans to Midwest were prohibited transactions; the Plan trustees had failed to diversify Plan investments; the Plan trustees had breached their fiduciary duties; the Plan trustees were personally liable for engaging in these prohibited transactions; and HCI was jointly and severally liable as a Plan fiduciary.

In August 1988, the parties to the DOL suit entered into a partial consent decree against Harmon, Green, HCI, and Midwest in the amount of $4 million. The judgment required HCI to pay the Plan $500,000 in cash as well as a $500,000 promissory note and required Harmon, Green, HCI, and Midwest to transfer to the Plan HCI stock valued at $3 million. The Plan in turn was required to transfer to HCI certain real estate which had been transferred previously from Midwest to the Plan and had a negative cash flow.

In May 1989, six of the Plan's beneficiaries filed an ERISA suit (the Roberts suit) in federal court against Harmon, Green, their wives Doreen Harmon and Lynda Green, and HCI, alleging that they had breached their fiduciary duties by engaging in the Midwest transactions. The Roberts suit defendants filed a third-party complaint against Nielsen & Senior and Gottfredson for breach of contract and negligence under state law. The purpose of the third-party complaint was to recover losses the Harmons and the Greens had to pay personally in the DOL suit and any losses they would have to pay in the Roberts suit. The lawyers filed a motion to dismiss the third-party complaint, alleging

that because there was no possible claim under ERISA, no federal jurisdiction existed over the exclusively state law claims and the federal court did not have subject matter jurisdiction. Judge David Winder granted the motion to dismiss without prejudice for lack of subject matter jurisdiction. Neither party appealed this ruling.

The Harmons and the Greens then filed the suits on appeal here, alleging breach of contract and professional negligence under state law and seeking damages in excess of $4 million. In the Harmons' case, Judge David Young granted defendants' motions to dismiss and for summary judgment on the grounds that ERISA preempted the Harmons' state law claims, the Harmons lacked standing to assert the claims, and the advice given by the lawyers was correct as a matter of law. In the Greens' case, Judge Dennis Frederick granted defendants' motion for summary judgment, ruling that ERISA preempted the Greens' claims and the Greens lacked standing to assert the claims. The primary difference between the two cases, therefore, is that Judge Frederick, in the Greens' case, did not rule on whether the advice given by the lawyers was accurate. Judge Young, on the other hand, ruled on the merits of the case, finding that the lawyers' advice was correct as a matter of law. The Harmons and the Greens appeal the respective rulings, claiming that (a) ERISA does not preempt state law claims against attorneys for breach of contract and malpractice in advising ERISA fiduciaries as to ERISA requirements; (b) former ERISA fiduciaries have standing to bring claims against attorneys who are not plan fiduciaries and who gave them legal advice regarding ERISA requirements; and (c) defendants are precluded from arguing a position in state court which is contrary to a position they previously asserted in federal court. In addition, the Harmons assert that genuine issues of material fact remain as to whether defendants' advice on ERISA failed to meet the appropriate standard of contractual and professional care as a matter of law.

■ Summary judgment is proper only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *K & T, Inc. v. Koroulis,* 888 P.2d 623, 626–27 (Utah 1994). A motion to dismiss is appropriate only when it is apparent that as a matter of law, the plaintiff could not recover under the facts alleged. Utah R.Civ.P. 12(b)(6); *Lowe v. Sorenson Research Co.,* 779 P.2d 668, 669 (Utah 1989). Because the propriety of both a summary judgment and a rule 12(b)(6) dismissal presents questions of law, we accord no deference to the trial court's determinations and review the issues under a correctness standard. *K & T,* 888 P.2d at 627; *Hunsáker,* 870 P.2d at 898; *Lowe,* 779 P.2d at 669. We determine only whether the trial court properly applied the governing law and, as to summary judgment, whether the trial court correctly held that no disputed issues of material fact existed. *K & T,* 888 P.2d at 627.

## ERISA PREEMPTION

The first question we address is whether the trial courts erred in holding that ERISA preempts state law claims against attorneys for breach of contract and professional malpractice arising from allegedly negligent advice given to ERISA fiduciaries concerning ERISA requirements. The relevant portion of the ERISA preemption statute states that ERISA shall "supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). Plaintiffs challenge the respective rulings of both judges below that their claims "relate[d] to" an employee benefit plan under ERISA. We agree with plaintiffs' contentions and reverse.

■ "The primary rule of statutory interpretation is to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve." *Sullivan v. Scoular Grain Co. of Utah,* 853 P.2d 877, 880 (Utah 1993). To discover that intent, we look first to the plain language of the statute. *State v. Larsen,* 865 P.2d 1355, 1357 (Utah 1993). In construing a statute, we assume that "each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Savage Indus., Inc. v. Utah State Tax Comm'n,* 811

P.2d 664, 670 (Utah 1991). "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *World Peace Movement v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994).

In interpreting the ERISA preemption provision, the United States Supreme Court has given the phrase "relate to" a " 'broad common-sense meaning.' " *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 1552–53, 95 L.Ed.2d 39 (1987) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). A state law "relates to" an employee benefit plan and thus is preempted by ERISA, " 'if it has a connection with or reference to such a plan.' " *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. ——, ——, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995) (quoting *Shaw*, 463 U.S. at 96–97, 103 S.Ct. at 2899–2900). Under this construction, a state law may "relate to" an employee benefit plan and be preempted even if the law is not specifically or directly designed to affect such plans. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). ERISA, however, " 'does not require the creation of a fully insulated legal world' " that renders all state law preempted whenever there is a plan in the picture. *United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Memorial Hosp.*, 995 F.2d 1179, 1193–94 (3d Cir.1993) (quoting *Rebaldo v. Cuomo*, 749 F.2d 133, 138–39 (2d Cir.1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985)). The Supreme Court has recognized that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner" to warrant finding that they "relate to" a plan. *Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. Consequently, a law of general applicability "that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan" may fall outside ERISA's otherwise broad preemptive reach. *See Ingersoll–Rand*, 498 U.S. at 139, 111 S.Ct. at 483. An example of such a law is the state garnishment law of general applicability at issue in *Mackey v. Lanier Collection Agency & Serv.,*

*Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), which the Court held not to be preempted to the extent that it did not single out ERISA plans for special treatment, despite the undisputed fact that "garnishment will involve and affect the plan and its trustees" in various ways. *Id.* at 831, 108 S.Ct. at 2186; *see also id.* at 842, 108 S.Ct. at 2192 (Kennedy, J., dissenting). In sum, ERISA preemption is not without limits, and "[a] purely semantic approach cannot be taken to its logical extreme." *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 244 (5th Cir.1990).

We therefore recognize that it is necessary to "go beyond the unhelpful text and the frustrating difficulty of defining [the] key term [of the ERISA preemption provision], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Travelers Ins. Co.*, 514 U.S. at ——, 115 S.Ct. at 1677. The purpose of ERISA is

> to protect ... participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b). To this end, the purpose of the ERISA preemption provision is twofold: to protect employees and their beneficiaries in employee benefit plans and to ensure that plans and plan sponsors are subject to a uniform body of benefit law by minimizing " 'the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.' " *Monarch Cement Co. v. Lone Star Indus., Inc.*, 982 F.2d 1448, 1453 (10th Cir.1992) (quoting *Ingersoll–Rand*, 498 U.S. at 142, 111 S.Ct. at 484); *see also Travelers Ins. Co.*, 514 U.S. at ——, 115 S.Ct. at 1677) ("The basic thrust of the preemption clause ... was to avoid a multiplicity of regulation in order to permit the national-

ly uniform administration of employee benefit plans."). This case therefore turns on whether plaintiffs' state law claims, namely, professional malpractice and breach of contract for legal services arising from the alleged malpractice, frustrate Congress's intent " 'to prevent state interference with federal control of ERISA plans.' " *United Wire*, 995 F.2d at 1193 (quoting *Rebaldo*, 749 F.2d at 138).

The issue of whether ERISA preempts state professional malpractice law has arisen on numerous occasions. Uniformly, courts faced with this issue have concluded that ERISA does not preempt state malpractice or similar negligence or fraud actions against *outside* nonfiduciary providers of professional services to ERISA plans. *See, e.g., Airparts Co. v. Custom Benefit Servs., Inc.*, 28 F.3d 1062 (10th Cir.1994) (plan benefit consultant); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531 (7th Cir.1991) (actuary); *Painters Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146 (3d Cir. 1989) (auditor); *Berlin City Ford, Inc. v. Roberts Planning Group*, 864 F.Supp. 292 (D.N.H.1994) (plan benefit consultant); *Horton v. Cigna Individual Fin. Servs. Co.*, 825 F.Supp. 852 (N.D.Ill.1993) (actuary); *Richards v. Union Labor Life Ins. Co.*, 804 F.Supp. 1101 (D.Minn.1992) (actuary); *Carl Colteryahn Dairy, Inc. v. Western Pa. Teamsters & Employers Pension Fund*, 785 F.Supp. 536 (W.D.Pa.1992) (accountants and actuaries); *Anoka Orthopaedic Assocs. v. Mutschler*, 773 F.Supp. 158 (D.Minn.1991) (attorneys and accountants); *Barrett v. Hay*, 893 P.2d 1372 (Colo.Ct.App.1995) (accountant); *Profit Sharing Trust for Marprowear Corp. v. Lampf, Lipkind, Prupis, Petigrow & Labue, P.A.*, 267 N.J.Super. 174, 630 A.2d 1191 (1993) (attorneys).

These courts have based their rulings on several considerations. Perhaps the most salient consideration is whether the state law in question regulates the terms, duties, or administration of ERISA plans. As the Tenth Circuit has recognized, there are four categories of laws which have been held to be preempted because they "relate to" ERISA plans:

"First, laws that regulate the type of benefits or terms of ERISA plans. Second, laws that create reporting, disclosure, funding, or vesting requirements for ERISA plans. Third, laws that provide rules for the calculation of the amount of benefits to be paid under ERISA plans. Fourth, laws and common-law rules that provide remedies for misconduct growing out of administration of the ERISA plan."

*Airparts*, 28 F.3d at 1064–65 (quoting *Martori Bros. Distribs. v. James–Massengale*, 781 F.2d 1349, 1356–57 (9th Cir.), *cert. denied*, 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986)); *accord National Elevator Indus., Inc. v. Calhoon*, 957 F.2d 1555, 1558–59 (10th Cir.1992), *cert. denied*, 113 S.Ct. 406 (1992). The Tenth Circuit has further summarized the type of state law claims which fall on either side of preemption:

"[L]aws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application—often traditional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental."

*Airparts*, 28 F.3d at 1065 (quoting *Monarch Cement*, 982 F.2d at 1452). Similarly, other courts have examined whether the law at issue governs "the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Memorial Hosp.*, 904 F.2d at 245. Accordingly, courts " 'are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities ... than if it affects relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan.' " *Id.* at 249 (footnote omitted) (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1467 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987)).

As noted above, a further factor courts have considered is whether the state law at issue governs an area traditionally left to the states. As a general matter, the Supreme Court has admonished that "ERISA preemption analysis 'must be guided by respect for the separate spheres of governmental authority preserved in our federalist system.'" *Fort Halifax Packing, Inc. v. Coyne,* 482 U.S. 1, 19, 107 S.Ct. 2211, 2221, 96 L.Ed.2d 1 (1987) (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981)). Actions for professional malpractice, such as the actions at issue here, have traditionally been left to state regulation, and for this reason, courts are reluctant to "intrude in this area" by foreclosing a state cause of action (or conversely creating an ERISA cause of action) for malpractice. *Painters,* 879 F.2d at 1152–53; *accord Nieto v. Ecker,* 845 F.2d 868, 871–72 (9th Cir.1988).

Taking all of the foregoing into consideration, we conclude that the state claims in this case do not "relate to" the Plan so as to compel preemption of the claims by ERISA. The state laws involved do not regulate the type of benefits or terms of the Plan; they do not create reporting, disclosure, funding, or vesting requirements for the Plan; and they do not affect the calculation of benefits under the Plan. *See Airparts,* 28 F.3d at 1065; *National Elevator,* 957 F.2d at 1558–59. Nor were the attorney defendants fiduciaries to the Plan or responsible in any way for Plan administration; thus, plaintiffs are not seeking state remedies for misconduct stemming from administration of the ERISA plan. *See Airparts,* 28 F.3d at 1064–65; *National Elevator,* 957 F.2d at 1558–59. Likewise, plaintiffs here are not employees resorting to state law to avail themselves of an alternative cause of action to collect benefits under a plan, nor do the state laws involved here apply specifically to ERISA plans or interfere in any way with the calculation of plan benefits. *See Airparts,* 28 F.3d at 1065; *Monarch Cement,* 982 F.2d at 1452. Accordingly, we agree with the Tenth Circuit's conclusion that state laws regulating professional conduct constitute laws of general application involving traditional areas of state regulation. *Airparts,* 28 F.3d at 1066, 1067.

We likewise recognize the Tenth Circuit's converse conclusion that common law tort and breach of contract claims are preempted by ERISA if they involve "efforts by plan beneficiaries to undo some allegedly improper act of plan administration." *Id.* at 1066. The claims at issue here, however, do not involve such a situation. Defendant lawyers were simply outside professionals who advised Plan fiduciaries and who "did not directly perform any administrative act vis-a-vis the [P]lan." *Id.*

Although plaintiffs' claims require reference to ERISA law to determine whether defendants met their duties under generally applicable state contract and professional malpractice law, ERISA law is not implicated beyond its mere subsidiary role as a reference for the appropriate standard of care. Such a tangential role of ERISA law does not relate these state law claims to the Plan itself. *Cf. Airparts,* 28 F.3d at 1066 (although recovery from defendants for state claims of negligence, fraud, etc., would increase plan coffers, such tangential effect was not enough to relate claims to plan itself) (citing *Hospice of Metro Denver, Inc. v. Group Health Ins., Inc.,* 944 F.2d 752, 756 (10th Cir.1991) (even potential liability of plan for judgment is insufficient to relate action to plan)); *see also Mertens v. Kaiser Steel Retirement Plan,* 829 F.Supp. 1158, 1162 (N.D.Cal.1992) (holding "the fact that professional malpractice claims require some interpretation of ERISA does not mean that these claims are preempted by ERISA").

Plaintiffs' claims will have no effect on "the structure, the administration, or the type of benefits provided by the plan." *Airparts,* 28 F.3d at 1066. Nor do these actions involve claims based on any rights under the plan or claims attempting to modify or enforce the plan. *See id.* There is no ERISA provision that addresses breach of contract or malpractice claims or that in any way conflicts with such claims. In sum, if we allow this suit to go forward, there is no threat that "conflicting regulations will emerge which will destroy the structural unity of the ERISA scheme." *Id.* (citing *Joos v. Intermountain*

*Health Care, Inc.*, 25 F.3d 915, 917 (10th Cir.1994)).

As to the purpose of ERISA's preemption provision, "[w]e see no congressional purpose to be furthered by denying [plaintiffs] a state cause of action against allegedly negligent third-party service providers." *Airparts*, 28 F.3d at 1066. ERISA was not intended to create a "'fully insulated world'" which relieves attorneys and other nonfiduciary advisers of their ordinary standards of care when advising ERISA plan fiduciaries. *United Wire*, 995 F.2d at 1193–94 (quoting *Rebaldo*, 749 F.2d at 138–39).

We note, finally, that preemption of plaintiffs' claims would leave them without any legal remedy for the lawyers' alleged malpractice.[3] If preemption were to apply in such cases, the state would have no way of insuring that attorneys and other professionals exercise due care when advising ERISA plan fiduciaries. The Harmons and the Greens, as well as similarly situated plaintiffs, would be without remedy or recourse for erroneous legal advice.

For the foregoing reasons, we conclude that the state claims involved here do not relate to the Plan and therefore are not preempted by ERISA.

## STANDING

 Plaintiffs contend that the respective trial courts erred in ruling that plaintiffs do not have standing to maintain these actions. We agree. First, we note that the ERISA standing requirements are not applicable to the actions involved here because plaintiffs do not assert claims under ERISA or on behalf of an ERISA plan. Rather, plaintiffs are seeking to remedy their personal injury which they assert resulted from defendants' allegedly negligent advice. Plaintiffs were forced to pay substantial sums of money out of their own funds to resolve claims asserted by the DOL and the Roberts suit plaintiffs. Plaintiffs now seek to recover the losses which they suffered individually. In bring-

ing these actions, plaintiffs are not acting in their fiduciary capacities.

Defendants characterize the allegedly negligent legal advice as not being given for the benefit of plaintiffs individually, but solely for the benefit of the HCI Plan. We disagree with this characterization. Defendants were advising plaintiffs as to plaintiffs' fiduciary duties. If defendants' advice was negligent and thereby caused plaintiffs to breach their duties as fiduciaries, then plaintiffs would be held personally liable for any resulting damages. *See* 29 U.S.C. § 1109. Defendants therefore owed a duty to plaintiffs individually. It is this duty upon which plaintiffs now base these claims. Consequently, defendants' citation to the ERISA provision requiring that actions taken in a trustee or fiduciary capacity be "solely in the interest of participants and beneficiaries" is entirely irrelevant to the cases at hand. 29 U.S.C. § 1104(a)(1). To the contrary, Utah standing law is the only relevant standing requirement for these actions. As required for standing under Utah law, plaintiffs have shown distinct and palpable injuries giving rise to a personal stake in the outcome of the dispute. *National Parks & Conservation Ass'n v. Board of State Lands*, 869 P.2d 909, 913 (Utah 1993). We therefore find that plaintiffs have standing to maintain the present actions.

## PROFESSIONAL NEGLIGENCE

 Finally, we address whether a genuine issue of fact remains as to whether the lawyers breached the professional standard of care and contractual duties required of them in advising plaintiffs. As discussed above, this presents an issue solely in the Harmons' case. In the Harmons' case, Judge Young ruled on this issue on the basis of the pleadings alone, stating that "the legal advice upon which plaintiffs' Amended Complaint is based was accurate and cannot give rise to the claims alleged in the Amended Complaint." It appears, however, that in making this ruling, Judge Young was looking solely at the accuracy of two letters prepared

---

**3.** Indeed, in this case a federal court already has held specifically that plaintiffs may not pursue

their claims in federal court.

by defendants.[4] Apparently, Judge Young agreed with defendants' argument below that the advice given in these two letters was accurate.

Defendants now make this same argument on appeal. Such an argument, however, does not adequately address the issue at hand, namely, whether the lawyers' conduct "measured up to the standard of care required of attorneys in their professional duties." *Jackson v. Dabney*, 645 P.2d 613, 615 (Utah 1982). Although the letters may have included accurate advice, such a conclusion does not in and of itself resolve the standard of care issue. The record indicates that some of the most important issues regarding possible malpractice in this case involve the advice the lawyers failed to give rather than the advice they actually gave.

The Harmons have submitted an unrebutted affidavit from ERISA expert Marc Gertner. Although defendants contend that Gertner's affidavit fails to state what facts he reviewed and on which facts he based his opinion, we conclude that the affidavit is sufficient. In his affidavit, Gertner identifies the date and nature of the communications at issue so that they are identifiable from the record. Gertner further identifies how the advice at issue fell below the standard of care required of attorneys in their professional duties. Although we expect that Gertner's testimony at trial will be more developed and include further specifics, his affidavit suffices for the purpose of summary judgment. *See Watkiss & Campbell v. Foa & Son*, 808 P.2d 1061, 1066 (Utah 1991) (upholding sufficiency of attorney affidavit which based familiarity with the case on review of "the pleadings, discovery, and other court documents in said action"); *see also Butterfield v. Okubo*, 831 P.2d 97, 104, 106 (Utah 1992). We further note that a genuine issue of fact remains as to whether the lawyers' advice extended beyond the two letters in evidence. For example, the record contains evidence that the lawyers gave advice about loans from the Plan and transfers back from Midwest on numerous occasions from 1976 to 1984.

For these reasons, we overturn Judge Young's order of dismissal and hold that a genuine issue of material fact exists as to whether the lawyers' advice met the required standard of professional care.

Reversed and remanded.

ZIMMERMAN, C.J., and HOWE and RUSSON, JJ., concur in Justice Durham's opinion.

STEWART, Associate C.J., heard the arguments but later recused himself.

4. These are the letters of January 5, 1978, and November 23, 1983.